JACKSON *v.* RICHARDSON.

Opinion delivered December 22, 1930.

*M. D. Bowers* and *Walter L. Pope,* for appellant.

*W. M. Ponder* and *W. P. Smith,* for appellee.

MEHAFFY, J. In July, 1902, G. J. Owen, a farmer about fifty-three years old, and a citizen of Randolph County, was convicted and sentenced to a term of twenty years in the penitentiary for the murder of his son-in-law, Henry Hall. The killing was alleged to have occurred February 18, 1902. Just prior to Owen's imprisonment he constituted Schoonover & Brown his attorneys in fact to rent his lands and collect the rents amounting to approximately $1,000 a year. He escaped from prison after having served about a year, and after his escape he would at intervals meet one of his attorneys and his tenant, J. M. Hurst, at some place named by him and receive his rents. This continued until June, 1923, when the last settlement was made, and since that time, so far as the evidence shows, he has never been seen. No communication has been received from him since about January 1, 1925.

Mr. Owen had three children: Vergie and Hattie, children of his first marriage, and Rubye, appellant, only child of his second and last marriage.

He acquired the lands involved in this suit about the year 1884. He had been separated from his wife at that time about eight years, and his two daughters, Hattie and Vergie, then about eight and twelve years old, went to live with him on the farm.

On December 18, 1894, he conveyed by deed his land to his two daughters, in consideration of the sum of one dollar and the further consideration of his natural love and affection for his daughters, Hattie and Vergie, three-fourths to Hattie and one-fourth to Vergie. He continued to farm and accumulate money, and at one time after that he had buried $4,000.

In May, 1896, Vergie conveyed her interest in the lands to Hattie. Still later Mr. Owen conveyed by deed another forty acres to Hattie in Randolph County and another forty acres in Clay County. Hattie thereby became the owner of 420 acres.

In 1899 Owen married again, and in 1900 the appellant, Rubye, was born.

In December, 1901, Hattie, who had married Henry Hall, conveyed to her father 120 acres of land which had formerly been deeded to her by her father in consideration of the sum of one dollar and the further consideration of the natural love and affection for the said G. J. Owen, father of the said Hattie Hall.

On the same date, December 27, 1901, Hattie conveyed by deed eighty acres of the land formerly deeded to her and Vergie, to her father for his natural life, and at his death to her sister, Vergie, in consideration of the sum of one dollar and the further consideration of the natural love and affection to her sister, Vergie Siebke, and her father, G. J. Owen. At the same time she conveyed back to her father the forty acres of Clay County land which he later sold.

Hattie then had 180 acres of land, Vergie a remainder in eighty acres of land which would be hers upon the death of her father, in addition to the one-fourth interest in the 340 acres of land which she had deeded to her sister, and this left Owen with 120 acres of land. Hattie paid Vergie $500 in cash for Vergie's interest in 340 acres. This conveyance was in 1896.

In 1914 Vergie conveyed to Hattie her remainder in the eighty acres deeded to her in 1901. It is alleged that if Vergie had kept her land it would have been worth $8,000 in 1894, and that Hattie's land in 1894 was worth $9,000. It is also alleged that the 120 acres of land which Owen owned at the time of his death was worth $12,000.

Schoonover and Brown hold $4,787.79, money belonging to the estate of Owen, and will receive in addition to this $660, making a total of $5,447.79 in cash.

This suit was begun by the appellant, Rubye Jackson, in the Randolph Chancery Court. She alleged that she and the defendants, Vergie Siebke and Hattie Richardson, were the only surviving children and heirs of G. J. Owen, who died intestate, seized and possessed of of 144 acres of land in Randolph County; that prior to Owen's death he had placed his lands in the charge of Schoonover & Brown, that they had collected rents amounting to more than $4,000, which they had not accounted for. She further alleged that her father, during his lifetime, had made certain advancements to Vergie and Hattie, which advancement to each of them was of equal or greater value than the estate left. She asked that her sisters be required to account for the property received by them, and that the property be so divided that each child would get an equal share.

Hattie Richardson answered, admitting that the plaintiff, Vergie Siebke, and herself were the only heirs of G. J. Owen. She then described the property she possessed, stated that she was the owner by virtue of a warranty deed, that the land was deeded to her and her sister by her father, and denied that the lands conveyed to her and her sister by her father were advancements.

Vergie filed answer, adopting the answer of Hattie as her answer.

The conveyances mentioned above were introduced in evidence, and witnesses were introduced who testified as to the value of the property, and that Hattie and Vergie assisted their father in farming, doing the same kind of work that men do on a farm. There was also evidence introduced showing the educational advantages of Hattie and Vergie given them by their father. A copy of complaint was introduced showing that G. J. Owen had brought suit in the Randolph Chancery Court against Hattie and Henry Hall, Randolph County Bank, and Bank of Corning. The suit was never tried, but Hattie and her father made a settlement.

In the complaint by Owen against his daughter it was alleged that the deeds made to her were in trust,

and that the daughters were to hold title during the time they remained unmarried, and that the grantor was to retain possession. It was alleged that, if either of the daughters married, she was to convey her interest to the other, and, if both of them married, then the land should be reconveyed to the father. There was no evidence offered tending to establish these facts, except the complaint which was filed by Owen.

Hattie Richardson testified that there were no such agreements made, and that her father got angry because she married Hall, and that this was the reason that he brought suit. This contention of Hattie is strengthened by the fact that her father afterwards was convicted of murdering her husband, Hall.

There was an intervention filed by Pearl Walley, claimed to be a grandchild of G. J. Owen, but the chancellor found that she was not his grandchild and dismissed her intervention for want of equity.

And the chancellor stated in his decree that there was a large amount of testimony directed to the intervention as to whether or not Pearl Walley was the grandchild of G. J. Owen, Sr., but there was very little, if any, conflict as to the other proof in the case, a good portion of which is documentary evidence.

The chancellor stated in his decree that the evidence tending to prove that the death of G. J. Owen, Sr., was circumstantial. It appeared that in January, 1902, he killed his son-in-law, Henry Hall, the husband of Hattie; was convicted and sentenced to 20 years in the penitentiary, escaped and became a fugitive; but he had given Schoonover & Brown a power of attorney about the time of his conviction, and communicated with them periodically until the final meeting in 1923, and that since that time he had never been seen or communicated with; that if living now he would be eighty years of age, and the court therefore finds that the evidence is sufficient to prove the death of G. J. Owen.

The chancellor, however, required an indemnifying bond to run for five years to be given by the parties held

entitled to the funds; that the bonds should be approved by the chancellor. The decree also recites that the final issue to be passed upon rests upon the answer to this question: "Was the deed executed by G. J. Owen in 1894, conveying all his property, consisting of some 340 acres of land, to his only then heirs, three-fourths to Hattie and one-fourth to Vergie, intended by him to be an advancement?"

Then, after discussing the facts, the chancellor found that the suit and settlement contradicts the idea of an advancement, and that, if the conveyance was intended as an advancement, the same could be revoked and rescinded, and a new agreement entered into during the lifetime of the parties, and the court held that the conveyance to Hattie and Vergie was not an advancement; to reverse this decree this appeal is prosecuted.

The court found that the evidence was sufficient to show that G. J. Owen was dead. It is true, as stated by the chancellor, that the evidence was circumstantial; but, as found by the chancellor, he would, if living, be more than 80 years of age, and he has not been heard of in several years. If the evidence is sufficient to justify the finding that one is dead, courts will so find whether the evidence is direct or circumstantial. "A well connected train of circumstances is as cogent of the existence of a fact as any array of direct evidence, and frequently outweighs opposite direct testimony." 23 C. J. 48.

This court, in discussing the scintilla rule, said: "While this rule is not to be ignored, it is equally well settled that any issue of fact in controversy may be established by circumstantial evidence where the circumstances adduced in evidence are such that reasonable minds might draw different conclusions therefrom." *St. L. I. M. & S. R. Co.* v. *Fuqua*, 114 Ark. 112, 169 S. W. 786; *Paragould & M. R. Co.* v. *Smith*, 93 Ark. 224, 124 S. W. 776; *St. L. I. M. & S. R. Co.* v. *Owens*, 103 Ark. 61, 145 S. W. 879; *Mo. Pac. Rd. Co.* v. *Hull, ante* p. 873.

Of course, where circumstantial evidence is relied on to establish any fact, the circumstances must agree

with and support the hypothesis which they are adduced to prove and the circumstances themselves must be proved.

The finding of the chancellor on this issue is supported by a preponderance of the evidence. The statute provides that under certain circumstances a person shall be presumed to be dead in any case in which his death may come in question unless proof be made that he was alive within that time. C. & M. Digest, § 4111.

In this case, however, there is something more than the presumption of death, there is proof of circumstances which we think justified the finding of the chancellor. He would be more than eighty years old; had been in the habit of calling on his attorney and tenant periodically to collect his rents; his rents had accumulated; and all these circumstances, together with his absence, are sufficient proof of his death.

Since the chancellor found that the circumstances showed G. J. Owen was dead, there was no reason for requiring an indemnifying bond. If proof of death had been made by direct evidence, of course no bond would have been required, and since a fact may be established by circumstantial evidence as well as by direct evidence, there was no occasion to require bond in this case.

The other question in the case is whether the conveyances by G. J. Owen in his lifetime to his daughters, Hattie and Vergie, were advancements or whether they were absolute gifts. It is argued that the settlement of the lawsuit establishes the fact that Owen contracted with these girls as a part consideration for the conveyance that they remain single, and they say, if that be true, the gift from the parent of the child must be absolute, and that the compromise is a part of the *res gestae* and therefore clearly admissible under the authorities. There is no evidence in the record about anything Owen did or said with reference to this settlement except what is contained in a complaint that was filed in court. The statements in this complaint contradict the terms of the

deeds; the complaint was not sworn to; it was filed by the attorneys of G. J. Owen, who doubtless prepared the complaint, and there is no evidence that Owen himself ever saw it; so, if it is conceded to be competent and admissible, it would be very slight evidence under the circumstances. All it could possibly amount to is a statement by the attorneys of what they understood was the claim of Owen.

As against this evidence, there are the conveyances themselves and the testimony of Hattie Richardson, who testified that her father did not like the man she married, Henry Hall, and was angry because she married him, and that that is the reason he brought the suit, and there is no evidence other than the statements in the complaint to contradict Hattie Richardson. It is contended that Hattie and Vergie worked like slaves on these farms, and that that was the reason Owen conveyed the land to them. This also contradicts the written instruments themselves.

If Owen had intended to convey the property to his daughters in payment for the work they had done, he doubtless would have so stated in the deeds, but the consideration was one dollar and natural love and affection.

It is entirely reasonable that the fact that his daughters did work and help him was the foundation, or at least increased his love and affection for them, but the conveyances did not mention the fact that the daughters had worked and assisted their father, but the only consideration mentioned was the one dollar and natural love and affection.

While it is true that his daughters performed labor and assisted their father, it is also true, as the record shows, that their father cared for them, maintained them, and educated them. There is nothing in the record to indicate that he cared more for these daughters than for the appellant, and she was deprived of the care and guidance of her father which the other daughters received.

The presumption is that the conveyances were intended as advancements, and we do not think there is sufficient evidence in the record to overcome this presumption.

Appellees quoted from 1 R. C. L. 665. The section quoted from, however, contains the following statement, among others: "The party asserting that it was the intention of the donor to make an advancement makes a *prima facie* case where he shows that the facts surrounding the supposed advancement are such that a presumption arises that the gift by the donor was an advancement. It then becomes necessary for the party claiming that the transaction was not an advancement to introduce evidence to overcome this presumption."

In this State the presumption is that a conveyance or gift by the father to his daughters is an advancement. *Eastham* v. *Powell*, 51 Ark. 530, 11 S. W. 823.

"It was admitted that plaintiff bought the land and paid the purchase money therefor, and caused his vendors to convey it to the defendant; and the defendant is the son of plaintiff. In the absence of other evidence, the presumption from these facts is that the conveyance was intended to be an advancement and not a trust." *Robinson* v. *Robinson*, 45 Ark. 481.

The court also said in the Robinson case: "The evidence necessary to overcome the presumption of an advancement, in a case like this, and prove a resulting trust, must not only be distinct and credible, but preponderate."

In another case decided by this court the evidence showed that the father conveyed to his son, who was a minor, and that after the son became of age and until he married he continued to reside with his father as a member of the latter's family. The father testified that he had the deed made to his son because he was advised that the deed could be better defended in his son's name, and that he had no intention of giving the land to his son, and one witness testified that a deed was exhibited to

him, and it was stated that it was made as a deed of trust to avoid trouble about the title, and there was evidence tending to show that the son had not claimed to be the owner of the land until a short time before bringing the suit. The court said: "The presumption of the law is that the purchase of the land in controversy was by way of an advancement to the son. The proof does not overcome this presumption." *White* v. *White,* 52 Ark. 188, 12 S. W. 201.

In the case of *Goodwin* v. *Parnell,* 69 Ark. 629, 65 S. W. 427, the court said: "The evidence adduced at the hearing of the cause clearly proved that the land conveyed to the defendant was a gift, but was conflicting as to the intention of the grantor to convey it as an advancement. * * *

"The conveyance of land by G. P. Goodwin to his son, Leon Goodwin, being voluntary, in the absence of evidence to the contrary, is presumed to be an advancement, the presumption being that a parent intends 'that all his children shall equally share in his estate, not only in what remains at his death, but equally in all that came from him.' The doctrine of advancement is invoked to effectuate this intention."

The rule is well stated in R. C. L. as follows: "For the doctrine that a parent desires to distribute his estate equally among all his children is so strong that, in the absence of clear and convincing evidence to the contrary, it will be presumed that a parent who during his lifetime makes a substantial gift to a child intended such gift to be an advancement; and hence it is often stated that a gift to a child or an heir by an ancestor in his lifetime is *prima facie* an advancement. A transfer of land by a parent during his lifetime to a child will be presumed to constitute an advancement of a portion or the whole of that child's share in the parent's estate, where the consideration expressed is nominal, and natural love and affection." R. C. L. 668.

The consideration expressed in the deeds by Owen is nominal, that is one dollar and natural love and affection.

No evidence in the record anywhere tends to show that it was not the intention of Owen to treat all his children alike, that is to so distribute his estate that his heirs would share equally.

Section 3485 of C. & M. Digest provides that, if an advancement is made, the value of such advancement shall be reckoned, and, if such advancement be equal or superior to the amount of share which such child would be entitled to receive of the real and personal estate of the deceased, then such child shall be excluded, etc.

Section 3487 of the Digest provides: "The value of any real or personal estate so advanced shall be deemed to be that, if any, which was acknowledged by the person receiving the same by any receipt, in writing, specifying the value; if no such written evidence exists, then such value shall be estimated according to its value at the time of advancing such money or property."

The decree of the chancery court is reversed and remanded with directions to hear evidence, determine the value of the advancements, and also of the estate, and enter a decree disposing of the property, so that each child will share equally.

HUMPHREYS and McHANEY, JJ., dissent.